IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| ROBERT KNIGHT, JR., | : | |
| | : | |
| Plaintiff, | : | Case No.: 5:23-cv-00494-TES-CHW |
| | : | |
| V. | : | |
| | : | Proceedings Under 42 U.S.C. § 1983 |
| Officer RENE MARTINEZ, | : | Before the U.S. Magistrate Judge |
| | : | |
| Defendant. | : | |
| | : | |

## ORDER AND RECOMMENDATION

Plaintiff Robert Knight, *pro se*, filed this suit pursuant to 42 U.S.C. § 1983, regarding his December 15, 2021 arrest by police officer, Defendant Martinez. (Docs. 1, 7). The parties have filed competing dispositive motions (Docs. 26, 31, 39), and the Court's show cause order regarding service costs is also pending. (Doc. 41). For the reasons explained below, Defendant is **ORDERED** to pay the costs of personal service, and it is **RECOMMENDED** that Plaintiff's "motion to resolve this legal issue without going to trial" (Doc. 26) and motion for summary judgment (Doc. 39) be **DENIED** and that Defendant's motion for summary judgment (Doc. 31) be **GRANTED**.

## FACTS

On December 15, 2021, Defendant Martinez, an officer with the City of Omega Police Department, encountered Plaintiff in a Dollar General parking lot. (Doc. 31-1, ¶¶ 1, 7; Doc. 39-12, p. 3-4). The parties dispute how this encounter began. Plaintiff says he was parked there and threw out a cigarette, which garnered Defendant's attention. (Doc. 26, p. 5; Doc. 39-2, ¶¶ 4-8). Defendant testified via affidavit and at Plaintiff's probation revocation hearing[1] that after he

---

[1] In support of his motion for summary judgment, Plaintiff provided a transcript of Defendant's direct

1

observed Plaintiff speeding, he activated his blue lights and pulled in behind Plaintiff in the parking lot. (Doc 31-1, ¶¶ 5, 7; Doc. 39-12, p. 6). Both parties and the video evidence confirm that Plaintiff was already out of his vehicle when Defendant first made contact with Plaintiff. (Doc. 26, p. 3; 31-1, ¶ 8; Doc. 39-1, p. 2; Doc. 31-2, Attachment 1, Defendant's Body Worn Camera Footage "Body Cam," 0:00:19).[2]

As Defendant opened his vehicle door, he told Plaintiff to get back in his car, to which Plaintiff responded, "For what?" (Body Cam, 0:00:19). Defendant again told Plaintiff to get back in his car, and Plaintiff again questioned why but appeared to turn toward his car in compliance. (*Id.*, 0:00:22-0:00:25). As Defendant said, "you know what, just stay right here," Plaintiff ran. (*Id.*, 0:00:27-0:00:28). Defendant told Plaintiff to quit running and deployed his taser, which caused Plaintiff to fall onto the ground in the parking lot. (*Id.*, 0:00:28-0:00:31). Defendant did not give Plaintiff a warning before using the taser. (*Id.*) As Plaintiff fell, a firearm fell from Plaintiff's person onto the ground. (*Id.*, 0:00:32). Plaintiff contends that this object was a cell phone, but the body camera footage conclusively shows otherwise. *Compare* (Doc. 39-1, p. 3-6; Doc. 39-2, ¶ 15) *and* (Body Cam, 0:00:32-0:00:35 (showing the gun fall from Plaintiff's person); 0:07:09-0:07:23 (showing Defendant pick up and clear the gun of a chambered round)).

Defendant requested backup and told dispatch that he had tasered Plaintiff. (*Id.*, 0:00:33-0:00:39). After being tasered, Plaintiff stood up and again attempted to run, at which time Defendant tasered Plaintiff a second time. (*Id.*, 0:00:37-0:00:39). Plaintiff again fell face first,

---

examination from a May 19, 2022 probation revocation hearing in the Superior Court of Tift County. (Doc. 39-12).

[2] The time stamps are from the video player and not from the face of the body cam video itself. Plaintiff argues that the date and time on the body cam are incorrect but does not appear to dispute that the video depicts the December 15, 2021 incident between Plaintiff and Defendant. *See* (Doc. 39-1, p. 7, 13; Doc. 42, p. 2).

which caused his face to bleed. (*Id*., 0:00:39, 0:01:50). Defendant explained that he switched the taser to "drive stun" mode once Plaintiff was on the ground. (Doc. 31-1, ¶¶ 28-29).

When Plaintiff was face down on the pavement, his hands were underneath his body. *See, e.g.,* (Body Cam, 0:00:39-0:00:46). Defendant told Plaintiff to put his hands behind his back and not to move or Defendant would use the taser again. (*Id*., 0:00:43-0:00:46). For nearly six minutes, Defendant continuously asked Plaintiff to make his hands visible or get positioned on his stomach in order to secure Defendant's safety. (Doc. 31-1, ¶¶ 25-57; Body Cam, 0:00:43-0:06:25). These commands were accompanied by multiple warnings that Defendant would again taser Plaintiff if he failed to comply. (*Id*.) At some point, Plaintiff rolled onto his back and refused to move to his stomach despite multiple commands. (Body Cam, 0:04:46). Throughout Plaintiff's failure to comply with Defendant's repeated commands and warnings, Defendant tasered Plaintiff on drive-stun mode at least nine times, each time consisting of several bursts. (*Id*., 0:00:43-0:06:25). Defendant last used the taser about four minutes into the encounter. Several cars can be seen in the parking lot of the store on the video, and Defendant spoke to at least one bystander about what she witnessed. The bystander stated that she heard Defendant give Plaintiff several commands and saw Defendant deploy his taser. (*Id*., 0:30:46-0:32:00).

During the encounter, Defendant called for EMS and again requested backup to his location. (Body Cam, 0:00:49, 0:01:11, 0:03:38, 0:04:36). The last request was because Plaintiff appeared to be convulsing, but the video shows that Plaintiff continued to speak. (Body Cam, 0:04:36-0:05:42). Defendant was able to handcuff Plaintiff only with the assistance of firefighters or EMTs who arrived on-scene almost seven minutes into the encounter with Plaintiff. (*Id*., 0:06:40). Plaintiff remained argumentative with the EMTs, repeatedly said he did not run from Defendant, and repeatedly asked to call his family. *See e.g.*, (Body Cam, 0:07:00-0:11-23; 0:13:20-

3

0:14:02; 0:15:55-0:23:30). Defendant assisted the EMTs and removed two taser prongs, one from Plaintiff's head that had attached through his baseball cap and one in Plaintiff's back. (*Id.*, 0:20:20-0:22:39). Two other prongs either did not attach or had come loose before they could be removed. (*Id.*)

Including the firearm that fell during the initial tasing, Defendant recovered drugs, two firearms, one of which was stolen, and cash from the searches of Plaintiff's person and vehicle. (Doc. 31-1, ¶ 61). When Defendant first took Plaintiff to the Tift County Jail, the jail booking officers refused to accept him. (Doc. 39-2, ¶ 20). Defendant then took Plaintiff to the hospital, where Plaintiff refused treatment, and he was then booked into the jail. (Doc. 31-1, ¶ 64-65; Doc. 39-2, ¶¶ 20-22; Doc. 39-7, p. 5). In addition to the injury to his face, Plaintiff claims that he now suffers from incontinence, blindness, and a permanent shoulder injury due to Defendant's use of the taser. (Doc. 26, p. 2).

## SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of informing the Court of the basis for its motion, and of citing "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that support summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). In resolving motions for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014).

Plaintiff attempted to comply with the Court's local rules and Federal Rules of Civil Procedure but failed to cite to the record for his original statement of material facts or specifically

4

address each of Defendant's numbered material facts. *See* (Docs. 26, 39). Federal Rule of Civil Procedure 56(e)(2) provides that if a party "fails to properly address another party's assertion of fact as required by Rule 56(c)," then the Court may "consider the fact undisputed for purposes of the motion." Rule 56(e)(2). This Court's Local Rule 56 similarly provides: "All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate." MDGA Local Rule 56. Finally, Federal Rule of Civil Procedure 56(e)(3) provides that the Court may "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to" summary judgment. Rule 56(e)(3). *See also Urdaneta v. Wells Fargo Bank, N.A.*, 734 F. App'x 701, 704 (11th Cir. 2018). Accordingly, because Defendant properly supported his factual assertions with specific citations to the record, and because Plaintiff has not specifically refuted them, the Defendant's facts may be accepted by the Court as undisputed.

## ANALYSIS

Both parties filed motions for summary judgment. In Plaintiff's motions, Plaintiff urges the Court to find that Defendant used excessive force when he tased Plaintiff. The evidence presented, however, does not support a finding that Defendant's use of force against Plaintiff was unreasonable or violated Plaintiff's constitutional rights. Instead, the evidence presented, even when construed in Plaintiff's favor, demonstrates that there are no genuine issues of material fact and that Defendant is entitled to summary judgment.

### A. Qualified Immunity

Defendant requests summary judgment on the ground that he is protected from suit under qualified immunity. When considering if summary judgment is appropriate based on qualified

immunity, the Court "[draws] all inferences and [views] all of the evidence in the light most favorable to the nonmoving party." *Jones v. Michael*, 656 F. App'x 923, 925 (11th Cir. 2016) (internal quotations omitted). However, if the nonmoving party's version of the facts is "blatantly contradicted," for example, "when a video recording exists of the pertinent events—as in this case—we 'view the facts in the light depicted by the videotape.'" *Id.* at 926 (quoting *Scott v. Harris*, 127 S.Ct. 1796, 1776 (2007)).

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotations omitted). Defendant, as a police officer, "cannot obtain qualified immunity unless [they] establish they were] acting within [their] discretionary authority." *Underwood v. City of Bessemer*, 11 F.4th 1317, 1328 (11th Cir. 2021). Conducting a traffic stop and making an arrest is within the discretionary function of an officer. *See, e.g., Johnson v. Nocco*, 91 F.4th 1114, 1119 (11th Cir. 2024); *Crosby v. Monroe Co.*, 394 F.3d. 1328 (11th Cir. 2004).

Once action under discretionary authority has been established, "the burden shifts to the plaintiff, who must show the [officers are] not entitled to qualified immunity." *Underwood*, 11 F.4th at 1328. "At this stage, [the court asks] two questions: (1) 'whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," and (2) if so, 'whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct.'" *Id.* at 1328 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231, 232 (2009)). Both must be present to for a plaintiff to prevail. *Id.*

*Whether Defendant's Use of Force Violated Plaintiff's Constitutional Rights*

Plaintiff alleges Defendant used excessive force in violation of his Fourth Amendment

rights. To determine whether excessive force violates the Fourth Amendment, the alleged misconduct is reviewed under an objective reasonableness standard. *Graham v. Conner,* 490 U.S. 386, 395 (1989). This determination requires balancing "the nature of the intrusion" on a person's Fourth Amendments rights "against the countervailing governmental interests at stake." *Id.* at 396. Making an arrest or conducting an investigatory stop inherently involves some physical coercion or threat. *Id.* Each use of force is fact and situation specific, and there is no precise test to determine reasonableness. Factors to consider under the totality of the circumstances include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397. "'Although suspects have a right to be free from force that is excessive, they are not protected against a use of force that is necessary in the situation at hand.'" *Jones*, 656 F. App'x at 929 (quoting *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 11th Cir. 2010).

Considering the totality of circumstances and construing the undisputed facts favorably to Plaintiff, the force used by Defendant to effect the arrest of Plaintiff was reasonable and not excessive. Although the initial speeding offense was minor, several factors indicate that Defendant's use of the taser – both the initial shots and then the bursts in drive stun mode – was reasonable in this case. Of note is the short time frame of the initial encounter, which created an environment where Defendant had to assess the situation in less than one minute. In the first 30 seconds, Plaintiff began the traffic stop by failing to obey Defendant's commands, and after two requests to get back in his vehicle and another command to stand still, Plaintiff ran. When Plaintiff

fell from the first taser shot, a gun fell from Plaintiff's person, and Plaintiff attempted to run again. Defendant, the only officer on scene, at that point did not know if Plaintiff would try to retrieve the gun or if he had another weapon. These unknowns explain why that once Plaintiff was on the ground, Defendant needed to be able to see Plaintiff's hands and know they were away from his pockets where other weapons might be. Plaintiff continued to resist or, at minimum, failed to comply with Defendant's commands despite multiple warnings that Defendant would use the taser and after Defendant followed through on those warnings. It was nearly six minutes after initially being tased, and not until firefighters arrived on the scene, that Defendant was able to handcuff and secure Plaintiff. Plaintiff's noncompliance risked not only Defendant's safety, but also customers at the store and bystanders in the parking lot. Plaintiff's continued noncompliance, and Defendant's inability to secure Plaintiff in this particular situation, counters any suggestion that the multiple drive stun bursts constituted unreasonable force. *See, e.g.*, *Buckley v. Haddock,* 292 F. App'x 791, 795-796 (11th Cir. 2008) (finding that continued use of a taser was reasonable where suspect continued to resist and had not been fully secured).

  Plaintiff argues that several factors make Defendant's use of force unreasonable, but the record does not support his arguments. He argues that Defendant failed to provide a warning before first deploying the taser, and points to the police department policy for support. (Doc. 39). Notwithstanding that only seconds passed between Defendant's instruction for Plaintiff to get back in his car, to stay right there, and to quit running before the taser was deployed, there is no requirement to provide a warning or even tell Plaintiff that he was under arrest before using the taser. *See H.M. v. Castoro*, 2024 WL 4799480, *5 (11th Cir. 2024) (citing *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004) ("Because [the plaintiff] repeatedly refused to comply with [the officer's] verbal commands, starting with a verbal arrest command was not required in these

particular factual circumstances."). Moreover, finding that a warning was necessary or practical in the few split seconds that Plaintiff ran and Defendant deployed the taser would require the precise hindsight judgment that *Graham* cautions against. *Graham*, 490 U.S. at 396-397 (The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.)

Plaintiff also contends that he was knocked out for a period of time. (Doc. 42, p. 3, citing Body Cam, 0:00:54-0:01:36). Although the body cam, consistent with Plaintiff's statement, shows no movement from Plaintiff during this timeframe, Defendant did not deploy the taser during the time Plaintiff was immobile. Plaintiff also argues that Defendant was on his neck and only moved to get Defendant off (Doc. 39-2, ¶ 17), but the video does show that Defendant was ever on Plaintiff's neck. Plaintiff remained combative with the EMTs, to the extent that they would not transport him despite the bleeding from his face. Defendant transported Plaintiff to the hospital, but he was not kept for treatment and was therefore booked into the jail. In light of the evidence, particularly the video evidence, Plaintiff's arguments do not demonstrate that Defendant's decision to deploy his taser was objectively unreasonable.

*Whether Defendant's Use of Force Violated Clearly Established Law*

Even if Defendant's use of force violated Plaintiff's Fourth Amendments rights, Defendant would be entitled to qualified community because Defendant would not be on notice of a clearly established at the time of the violation.  "A federal right is clearly established when the contours of the right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Jones*, 656 F. App'x at 926 (internal quotations omitted).

Plaintiff has offered no direct cases which would have put Defendant on notice that his conduct was unconstitutional as required to overcome qualified immunity. To the extent that

Plaintiff would argue that Defendant's conduct was so egregious or obvious that every officer would be placed on notice that it violated the Fourth Amendment, that argument is unpersuasive. This narrow exception typically requires "two common elements: that the plaintiff was not resisting and that he was subdued when the challenged force was used." *H.M.*, 2024 WL 4799480, *5. Neither of these elements were present during Defendant's encounter with Plaintiff. Plaintiff initially attempted to flee from Defendant, was tasered, stood up, and attempted to run before being tasered a second time. Defendant switched and used the taser in drive stun mode when Plaintiff continued to fail to comply with commands amid multiple warnings that he would be tasered. Despite multiple uses of the taser in drive-stun mode, Plaintiff still was not handcuffed and secured until fire fighters arrived on the scene. Defendant's use of the taser, in this scenario, did not go "far beyond the hazy border between excessive and acceptable force…" such that Defendant would have been put on notice that his action would violated Plaintiff's clearly establish rights for the purposes of qualified immunity. *Id*. at *6; *see also, Hoyt v. Cook*, 672 F.3d 972 (11th Cir. 2012) (finding muti-time use of a taser in drive-stun mode did not violate a clearly established right). Defendant is entitled to qualified immunity.

  B. **Service Costs**

The Court ordered Defendant to show cause why he should not be required to pay the costs incurred to have him personally served, especially after defense counsel had already appeared for the original defendants before the screening order directed service on Defendant Martinez. (Doc. 41). Defendant argues that he should not be assessed the costs of personal service because the original waiver was mailed to an incorrect address and that he did not delay the proceedings because he answered nine days after being personally served. (Doc. 41). Additionally, defense counsel, Jennifer Herzog and Nicholas Kinsley, explained that their "normal practice [is] to accept

10

or acknowledge service as to their clients when so requested, [… and an] acknowledgement/waiver was never sent to [defense counsel]."

This argument is unavailing because it overlooks the fact that defense counsel had already appeared in this case to file a premature motion to dismiss, and therefore, received an electronic notification when the screening order and waiver request were issued.[3] Instead of proactively accepting service, Defendant, through defense counsel, chose a wait-and-see approach to see if personal service would be perfected before filing his answer. As such, the Court was forced to expend the time and resources of the United States Marshals Service to effect service. Defendant is therefore **ORDERED** to remit the costs incurred by the Marshals Service to serve Defendant, in the amount of $172.88 (Doc. 24), to the Clerk of Court within 14 days of this Order.

## CONCLUSION

Based on the foregoing, there are no genuine issues of material fact and Defendant is entitled to judgment as a matter of law. It is **RECOMMENDED** that Defendant's motion for summary judgment (Doc. 31) be **GRANTED** and that Plaintiff's "motion to resolve this legal issue without going to trial" (Doc. 26) and motion for summary judgment (Doc. 39) be **DENIED.** Defendant is ordered to pay $172.88 to the Clerk of Court within 14 days of this Order.

## **OBJECTIONS**

---

[3] Ms. Herzog was not electronically copied by the Court's electronic filing system on any filing until Defendant's motion to strike (Doc. 40) was filed. Her electronic signature appears on Defendant's response to the show cause order (Doc. 45), and, therefore, it is possible that Ms. Herzog's argument that *she* as "the undersigned" was never sent a waiver is technically true. However, Ms. Herzog's co-counsel plainly did receive it.

The motion to dismiss (Doc. 5) was electronically filed by Mr. Kinsely, a lawyer at Ms. Herzog's law firm. The screening order and recommendation (Doc. 10), the request for waiver of service (Docs. 11, 12), and every document filed through Plaintiff's motion for summary judgment (Doc. 39) were sent to Mr. Kinsley using the following email addresses: nkinsley@hallboothsmith.com, cugalde@hallboothsmith.com, lschofill@hallboothsmith.com, and sbennett@hallboothsmith.com. If these email addresses are longer correct, it is it the responsibility of defense counsel to correct them.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to this Recommendation, or seek an extension of time to file objections, **WITHIN FOURTEEN (14) DAYS** after being served with a copy thereof. Any objection is limited in length to **TWENTY (20) PAGES.** *See* M.D. Ga. L.R. 7.4.  The District Judge shall make a de novo determination of those portions of the Recommendation to which objection is made. All other portions of the Recommendation may be reviewed for clear error.

The parties are further notified that, pursuant to Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice."

**SO ORDERED AND RECOMMENDED**, this 10th of July, 2025.

s/ Charles H. Weigle_____
Charles H. Weigle
United States Magistrate Judge